## Appeal of GRAY & DAVIS, INC.    Docket No. 143.

A corporation organized in March, 1912, and thereafter engaged principally in manufacturing electric starting and lighting devices for automobiles was in 1918 not carrying on the same trade or business as a preceding partnership which for many years prior to March, 1912, had been engaged entirely in manufacturing non-electric carriage and automobile lamps, and is not within the provisions of section 330, Revenue Act of 1918. The pre-war net income to be used in computing its war-profits credit should be the net income of the taxpayer for the year 1913, sections 310 and 311.

Submitted November 11, 1924; decided December 23, 1924.

*Phillips Ketchum, Esq.,* and *W. Sidney Felton, Esq.,* for the taxpayer.

*Arthur H. Fast, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, and TRAMMELL.

This appeal involves a deficiency in income and profits taxes for the calendar year 1918 arising from a reduction of the taxpayer's pre-war net income and a consequent reduction in its war-profits credit under the Revenue Act of 1918, sections 310, 311, and 330. The question briefly is whether this is a case under section 330 " of the reorganization, consolidation, or change of ownership after January 1, 1911, of a trade or business now carried on by a corporation." Oral hearing was held at which witnesses testified for the taxpayer.

### FINDINGS OF FACT.

For many years prior to March, 1912, the firm of Gray & Davis was a general partnership carrying on at Amesbury, Mass., the business of manufacturing and selling carriage lamps. They began originally many years ago in a very small wood building where they made old-fashioned buggy lamps lighted with tallow candles. From time to time the building was enlarged by adding new sections, an additional story and a cellar. A small portion of the building in 1912 was brick but most of it was wood. With the gradual progress of the business the lamp changed from the candle to the oil wick and then to acetylene gas. They were making acetylene gas lamps in 1912 when the partnership ceased. They never manufactured an electric lamp for commercial sale, although they had been giving it consideration. Amesbury is located about 48 miles northeast of Boston and has a population of 7,000 or 7,500 inhabitants. It has never had any skilled labor. The lamp factory employed on an average from 180 to 220 persons and never more than 250. Of these, the only skilled employees were "buffers" who polished and finished the lamp reflector, and the number of these varied from 12 to 20. It would have been impracticable to manufacture anything on a large quantity production basis in Amesbury because of the limitation of the labor supply. This was true as to automobile lamps and starting and lighting devices. The location of Amesbury also involved, as to automobile lamps, a competitive difficulty in transportation in that it was far away from the important centers of Detroit and Cleveland where automobiles were being manufactured in greatest number. The lamps would have required very careful packing and handling to avoid damage and the freight rates were relatively high.

Thus the advent and rapid growth of the automobile industry made it apparent that the manufacture and sale of carriage lamps at Amesbury could not be relied upon as a satisfactory business for more than a short time. With this in mind the individual partners sought a new business. About 1911 they began the experimentation which two years later resulted in the strikingly successful business of Gray & Davis, Inc. For this purpose they rented a loft on Lansdowne Street in Boston where they began experiments to devise a commercially successful electric starting and lighting system for automobiles. The chief engineer of the General Electric Co. was employed at a substantial salary to assist in the project. He had had nothing whatever to do with the manufacture of lamps. At this place no attempt was made to produce anything in quantity on a commercial basis. Single articles were made and sent for trial to automobile manufacturers, a man being sent along to participate in the trial and observe the results. For almost two years their efforts were devoted to the attempt to devise something which would work and could be produced commercially. The expense of this experimental laboratory was carried in the partnership accounts but entirely separate from the Amesbury lamp business. When, in 1912, the new starting and lighting devices had been proven to be practical, the business of their manufacture and exploitation was

established, adequate financing accomplished, and a new corporation organized.

. The articles of organization of the corporation are dated March 27, 1912, and show its purpose and business in part as follows:

1. To manufacture, buy, sell, export, import, and otherwise deal in vehicles, self-propelled or otherwise, air and water crafts, and all appliances or conveniences connected therewith, and especially (but without limiting the foregoing general description) lamps or lighting devices, and devices for starting motors of all kinds; and further to manufacture and in any and all the above described ways to deal in machinery, tools, generators of power and apparatus necessary or useful in the manufacture or marketing of any and all of the above-mentioned articles.

2. To manufacture, grow, produce, buy, sell, export, import, and otherwise deal in any and all kinds of materials and supplies, products and by products, and merchandise of every sort.

The total authorized capital stock was 5,000 shares of preferred and 7,500 shares of common, having an aggregate par value of $1,-250,000, of which 2,500 shares of preferred and 5,000 shares of common were originally issued. Cash was paid in by the public for 2,250 shares of preferred and 5 shares of common for the purpose of building a plant at Cambridge, and the remaining 250 shares of preferred and 4,995 shares of common were issued for the assets and liabilities of the copartnership of Gray and Davis—the net assets thus acquired being stated at $533,000. Thereafter new stock was issued from time to time until in the taxable year 1918 there was outstanding $600,000 preferred and $1,250,000 common stock and the balance sheet showed assets of over $3,000,000, including goodwill and licenses of $308,000. There were then between 600 and 700 stockholders.

The corporation then owned three plants, the original lamp factory at Amesbury, a large modern semireinforced concrete building on the Charles River in Cambridge, and a plant at Amesbury called the munition plant, used by the corporation during the World War for the special manufacture of cartridge cases. The Cambridge plant was built in 1912 and 1913 after the partnership had ceased to exist, and has been devoted entirely to the manufacture of starting and lighting systems. The old lamp factory at Amesbury has already been described and it should be added that it has never been used for the production of electric lamps or of starting and lighting devices. On the other hand, the Cambridge plant has never been used for the lamp business. It does not appear clearly from the record what use has been made of the so-called munition plant since the close of the war. The Cambridge plant is located about 2 miles from the center of Boston and employs normally from 1,200 to 1,600 persons, 80 per cent of whom are skilled.

The factory manager of the taxpayer described in detail the difference in the processes of manufacturing lamps as previously done at Amesbury and manufacturing the electrical equipment as later done at Cambridge. The manufacture of a lamp is a comparatively simple process of pressing out sheet brass or other metal into the proper shape and attaching thereto some small standard purchased castings and parts like nuts and screws; cutting out the glass and attaching it, and polishing the reflector. The actual illuminating material, such as the candle, the oil and wick, or the gas or electricity is no part of the lamp as manufactured and sold. The manufacture

of the electric devices produced at the Cambridge plant is entirely different. It is extremely technical and precise and requires the most delicate machinery. None of the machinery used in the lamp factory could be utilized for it. The generator was viewed at the hearing and described in detail, as was the lamp. The generator is very complicated and is composed of numerous parts, some of which require a precision of manufacture to the five-thousandth of an inch. One process, the winding of the armature, is done by girls who are highly skilled. They are specially trained, and their training for three to six weeks is unproductive. A girl does not attain maximum efficiency until she has been engaged in the work for two years.

The customers of the lamp business did not become the customers of the corporation's lighting and starting business. The purchasers of generators did not buy lamps and the purchasers of lamps did not buy generators. They were not the same class of customers, and in no instance did a single purchaser buy both. In 1922 the lamp business was finally discontinued because it was unprofitable and could not be sold. The difference in the volume of business done by the partnership and that of the corporation is shown by the following statement of gross sales; 1912 was the year the partnership ceased and the corporation began and is therefore not a full year for either.

Partnership:                                                    Gross sales.
  1908_____ $240, 399
  1909_____   255, 000
  1910_____   573, 000
  1911_____   479, 000
Corporation:
  1913_____ 3, 871, 000
  1914_____ 3, 532, 494
  1915_____ 3, 527, 835
  1916 (not in evidence)_____
  1917_____ 5, 797, 000
  1918_____ 5, 615, 000

These totals were attributable to the several plants approximately as follows:

| | Amesbury. | Cambridge. | Total. |
|---|---|---|---|
| 1913 | $760, 000 | $3, 111, 000 | $3, 871, 000 |
| 1914 | 526, 000 | 3, 006, 000 | 3, 532, 000 |
| 1915 | 635, 000 | 2, 892, 000 | 3, 527, 000 |
| 1917, lamp | 530, 000 | } 5, 028, 000 | 5, 797, 000 |
| munition | 23~, 000 | | |
| 1918, lamp | 43b, 000 | } 4, 803, 000 | 5, 615, 000 |
| munition | 376, 000 | | |

After the organization of the corporation and its original financing, all further financing was done by selling stock to the public through financial houses on commission. In 1918 the members of the former partnership did not hold a majority of the outstanding stock.

The Commissioner has taken the net income of the partnership and of the corporation for the three statutory pre-war years of 1911, 1912, and 1913, and upon those figures has computed an average pre-

war net income as the basis of the taxpayer's alleged war-profits credit. A deficiency for the year 1918 is asserted amounting to $112,048.78, which is in part based upon the war-profits credit thus computed. The amount thus attributable is the subject of this appeal. The remainder is not disputed.

### DECISION.

The deficiency determined by the Commissioner is disallowed to the extent that it results from the computation of the war-profits credit on a basis other than the net income of the taxpayer for the year 1913. The years 1911 and 1912 should be excluded in computing the pre-war net income. Final order of the Board will be entered upon stipulation of the parties as to the correct amount of the deficiency in accordance with this decision or after further hearing upon motion of either party.

### OPINION.

STERNHAGEN: This appeal involves the war profits and excess profits tax imposed by the Revenue Act of 1918. The plan of that tax, as is now well known, was to tax business profits in excess of what Congress regarded as a normal standard. The standard adopted was the average annual earnings of the taxpayer for the three years 1911, 1912, and 1913, those being the most recent years not affected by the war, when it might be assumed generally that business was going along its normal course. The earnings of a trade or business during that peacetime period were believed to reflect a fair return upon its invested capital, and the extent to which its profits exceeded such return became the measure of its excess profits and war profits tax. This plan was accomplished (omitting details) by applying the so-called pre-war net income as a credit against the net income for the taxable year and treating the remaining income as war profits subject to the profits tax. Thus the amount to be taken as the pre-war net income seriously affects the amount of the profits tax and is of substantial importance. If the amount of pre-war income is low, its credit may leave a large amount of net income for the taxable year to be subjected to the profits tax; and conversely, a high credit for pre-war net income proportionately reduces the taxable profit. The income tax, which is a simple percentage of the total net income, is in any event applicable and is not now a part of this consideration.

The foregoing was the plan in the case where the corporation taxpayer was in existence during the entire period of three pre-war years. If a corporation was only in existence one or two of the three years, its credit was computed upon the net income of such full pre-war years as it was in existence. If, however, the corporation of the taxable year was carrying on a business which had been in existence during the entire pre-war period but during that period had been reorganized, the net income of the business for the entire pre-war period should nevertheless be used in computing the credit. And so it can be understood why it is significant to determine whether the business carried on by the taxpayer during the taxable year 1918 was

the same trade or business after the reorganization as was carried on in another form during the pre-war period.

For greater precision we quote the material portions of the Revenue Act of 1918.

SEC. 310. That as used in this title the term "pre-war period" means the calendar years 1911, 1912, and 1913, or, if a corporation was not in existence during the whole of such period, then as many of such years during the whole of which the corporation was in existence.

SEC. 311. (a) That the war-profits credit shall consist of the sum of:

(1) A specific exemption of $3,000; and

(2) An amount equal to the average net income of the corporation for the pre-war period, plus or minus, as the case may be, 10 per centum of the difference between the average invested capital for the pre-war period and the invested capital for the taxable year. * * *

SEC. 330. That in the case of the reorganization, consolidation, or change of ownership after January 1, 1911, of a trade or business now carried on by a corporation, the corporation shall for the purposes of this title be deemed to have been in existence prior to that date, and the net income and invested capital of such predecessor trade or business for all or any part of the pre-war period prior to the organization of the corporation now carrying on such trade or business shall be deemed to have been the net income and invested capital of such corporation. If such predecessor trade or business was carried on by a partnership or individual the net income for the pre-war period shall, under regulations prescribed by the Commissioner with the approval of the Secretary, be ascertained and returned as nearly as may be upon the same basis and in the same manner as provided for corporations in Title II, including a reasonable deduction for salary or compensation to each partner or the individual for personal services actually rendered. * * *

In the present case it appears as a fact that the gross sales of the partnership in the lamp business were, for the year 1911, the last full year of its existence, about $479,000, and those of the corporation for 1913, the first full year of its existence, were $3,871,000—eight times as large. The question is whether the standard for the computation of its taxable war profits shall be the comparatively low average of the combined pre-war net income of the partnership and the corporation or the net income for the single year 1913, that being the only full year of the pre-war period after the organization of the corporation. This depends upon whether the business of the taxpayer in 1918 was in substance in existence during all of the pre-war period, having since 1910 merely experienced a reorganization, consolidation or change of ownership, or whether it was a different trade or business which came into existence after the beginning of the pre-war period. It is not a question whether as a matter of law the corporation was the successor of the partnership, as clearly, as conceded by the taxpayer, it was, but whether the succession was in the same trade or business.

In determining this question the facts in the record before us must be controlling, and they convince us that the trade or business of the taxpayer in 1918 was substantially different from that carried on by the former partnership. Not only was the manufacture and sale of electric motors, generators, and starters an entirely different enterprise from the manufacture of carriage lamps; it had to be different. The lamp business at Amesbury, carried on as it was in a small village far from the market, without labor supply, and serving an economic need that was manifestly passing, could not long survive. The members of the partnership were sagacious enough to realize this promptly and

courageous enough to act upon it. The attempt was not to adjust an antiquated business to new demands and reorganize it. A new venture was sought and found; and when it was believed to be commercially sound, a corporation was formed and capital secured to establish it. But it had nothing to do with the lamp business. The fact that the lamp business was taken into the corporation can not be controlling, for that was only an incident of the new scheme, carried along until its necessary abandonment in 1922. From the time of the corporation's organization its business was many times in volume that of the Amesbury business and this was due not to the long established lamp trade, its customers, credit, location, or other good will, but to the mechanical perfection and commercial practicability of the new article.

In view of the facts as they appear it would be unjust to adopt as the standard of profit for this business the earnings of the lamp business. Even to take the earnings of the first full year of the existence of the new business as the norm of profit is an artificial formula, and conceivably in many instances would lead to an artificial result. But in constructing plans for revenue, especially for war finance, Congress has the right in its legislative wisdom to adopt an artificial formula, and when it does so the formula must be applied with whatever individual hardship it may involve. The statute clearly requires that the full years of the taxpayer during the pre-war period shall be used, and no exception is made in cases where the taxpayer is engaged in an infant industry; so there is no escape from the use of the 1913 earnings. Beyond this the statute is not compelling, and we think the adoption of the earnings of both organizations for the entire pre-war period of 1911, 1912, and 1913, as has been done by the Commissioner, is not warranted by law and must be disapproved.